May it please the court, my name is Sean Malone, counsel for petitioners Michelle Barnes, Blaine Ackley, and Patrick Connery. I would like to address three points today and answer any questions you may have. First, the doctrine of issue exhaustion, that is whether the petitioners raise the issue of indirect effects of increased air traffic, air pollution, and the separate issue of NEPA significance. The second point I'd like to address is that of indirect effects, whether it is reasonably foreseeable that doubling the capacity, that is the ground capacity, of the busiest airport in the state of Oregon may result in increased air traffic and air pollution. And as a corollary of that point, whether the case law requires that an increase in ground capacity at a facility, including an airport, requires the agency to assess the indirect effects of that increase in capacity. And if there's time, finally, I would like to address the issue of whether it was air for the agency to prohibit the public from addressing other members of the public at the alleged public hearing that was held. To the first point of issue exhaustion, a handful of legal principles can be distilled from the Ninth Circuit's case law on issue exhaustion. First, a petitioner need not cite to a specific statute or regulation. Second, a petitioner need not use a specific legal term of art drawn from that statute or regulation. Third, if the agency responds to a comment, then the agency is therefore on notice of that specific comment and that issue has been raised. Fourth, an agency need not specifically be responsive to a particular comment in order to still have raised that issue, as long as it has been raised. Fifth, the petitioner need only raise issues in general terms. And then finally, as Judge Clarence Thomas of the Supreme Court stated in Sims v. Apfel, in non-adversarial proceedings, the rationale for issue exhaustion is much weaker than it is for adversarial proceedings. Here we have a non-adversarial proceeding below. Now, Petitioner Blaine Ackley, on behalf of himself and his wife, squarely raised the issue of increased aircraft activity in his comments when he said, and I quote, Increased air traffic will affect our quality of life. Now, that is simply raising the issue of increased air traffic. That can be found in Supplemental Excerpt of Record 109. Petitioner Connery then went on to state, raise the issue of increased aircraft activity in terms of the airport's unrestrained growth over the years. He said, and I quote, This action is driving down property values and livability. With a large number of jets and aviation flights 24-7, it is time the Port of Portland to assist the property owners who suffer from this unbearable growth and noise impact of Hillsborough Airport. That can be found in Supplemental Excerpt of Record 51. Now, as I said before, if an agency responds to a comment, then that issue is essentially raised as the agency was on notice of it. Now, in response to that comment from Petitioner Connery, the agency stated, and I quote, The response to this comment also notes that failing to provide the proposed improvements at HIO, Hillsborough Airport, would not reduce aircraft activity. Now, this is sort of a roundabout way of stating that the action alternatives would not increase aircraft activity relative to the no action alternative. Now, the agency actually says that three different times throughout its response to comments. Again, it's sort of this roundabout way of saying that. That can be found at Supplemental Excerpt of Record 75, Supplemental Excerpt of Record 106, and then the one I just quoted was Supplemental Excerpt of Record 52. Again, that's the agency responding to this notion that there will be an increase in aircraft activity by saying that, no, there won't be an increase in aircraft activity relative to the no build. Keep your voice up, counsel. Oh, excuse me. And then, just to go on, the agency's response to that same comment from Petitioner Connery addresses air pollution. The agency quotes in its response to the comments, In addition, as noted in the response to comment MB-11, that's Michelle Barnes' comments, the proposed runway would reduce air pollution and would also reduce noise exposure for the majority of local residents. Again, the agency responded to this issue of increased air pollution by saying, no, there will be no air pollution. Petitioner Barnes then goes on to state, address the issue of increased aircraft activity through growth, and she also addresses the issue of pollution as well as NEPA significance. First, she states, in fact, the Hillsborough Airport has more operations than PDX. Hillsborough, which is less than one-third the size of PDX, that's Portland International Airport, in terms of acreage, now logs more annual operations than any other airport in the entire state. And she raises the issue of air pollution. The reduction in noise and toxic emissions would be a boon to the environment and livability. She goes on to state that gas-guzzling aviation activity spews a host of pollutants into the environment, including lead, benzene, carbon monoxide, and carbon dioxide. That can be found in supplemental excerpts of records 67 and 83. And then Ms. Barnes goes on to raise the issue of NEPA significance. Again, these need only be raised in general terms. Ms. Barnes goes on to state that it is also troubling that the Port is currently engaged in a scheme to draft an environmental assessment at Hillsborough Airport contending that this facility, which logs close to a quarter of a million annual operations, has no significant environmental impact. This is nothing short of astonishing, especially in light of the fact that there are now more annual operations at Hillsborough than at PDX or at any other airport in the entire state of Oregon. The intent is obviously to downplay the noise, pollution, safety, and security impacts of aviation activity. That can be found in supplemental excerpts of records 66 through 67. Now the agency's response to that, they cite the National Environmental Policy Act and state that their actions are consistent with it, and then go on to say that in all cases, thresholds of significance used are consistent with federal guidelines. By reducing congestion and delay, the proposed action would reduce air emissions compared to the no-action alternative. Again, the issue of these thresholds of significance under the National Environmental Policy Act have been responded to by the agency in their response to comments. That is something that, in terms of issue exhaustion, puts the agency on notice. That last one can be found in supplemental excerpts of record 77. And again, the agency goes through this sort of roundabout way of stating that there will be no increase in aircraft activity relative to the no-build alternative two different times at supplemental excerpts of record 106 and then 75. And then to move on to the issue of indirect effects. Indirect effects are those effects, like you're most likely aware, that are caused by the action that are later in time, farther removed in distance, but are still reasonably foreseeable. And for this case, it's important to note that the definition is broader than that. It goes on to state that indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on air and water. Hence, increase in air pollution as a corollary of the increase in aircraft activity as a result of the increasing capacity, the dramatic increase in capacity. Could you address our case law? So we have a body of case law that says that when airport construction is designed to address an existing demand or a predicted demand curve, and here we have a master plan that was updated by their technical consultant saying, yes, this is the existing demand curve. In that sort of situation, the agency is not obliged to look at growth-inducing effects. And there's three or four cases along those lines. Sure, I'd be happy to address that. I think the most fundamental part of that is all of those cases that say that did not engage in any capacity-enhancing mechanisms, procedures. They were all either – I have all those cases for you right here. And I think one of the important things to recognize is that if the agency could just say, well, we're dealing with existing problems, and therefore they could then obviate the statutory requirement to deal with indirect effects if they could just say in their purpose and need that we're dealing with existing problems. But I think the most important part of it is that the cases you're probably referring to are either redesigning airspace or extending a runway or relocating an existing runway in an attempt to make things more efficient. And in none of those cases have they increased the capacity of the airport, let alone increased the capacity of the airport to the significant degree that is going on here. We are doubling. Now, why does that make a difference? It's interesting because we have one case, I think, Ocean Advantage, which says, yes, there's a distinction because those cases weren't increasing the capacity. But there was no explanation as to why that made a difference on the basic theory, which is that if you're only addressing a predicted demand curve, then we don't think that has a growth-inducing effect. Why is it different for increasing capacity just as a factual matter? Sure. I think the case you're referring to is Ocean Advocates out of the Ninth Circuit, where BP constructed an addition to one of their oil refinery docks. And in that case, well, just to answer your question first before addressing that case, under each alternative the agency alleges that there will be an increase in activity. Well, they're saying there's going to be regardless. There's an existing demand. That's our Seattle Community Council, Morongo, I guess City of L.A. Sure. And, again, in each of those cases there's no increase in capacity. And I think the difference is that when you increase the capacity of the airport, you then accommodate for much more activity, whereas if you just redesign airspace it would make things more efficient to address existing congestion or delay. Okay. I guess I'm still puzzled by that as a distinction. We also have this case, National Parks and Conservation, and in that case there was an increase in the runway. And the question was, well, is this going to cause more flights than you would have otherwise, so we have to worry about these alien species? And there the court said, or the majority said, no. Again, just because you build in addition to the runway doesn't mean that there's going to be more flights. So it seems to be counter to your theory that increasing capacity per se is a growth-inducing impact. What should we do with that case? Well, again, I think that case focused more on this issue of it was more attenuated as to whether it would allow alien species to access parts of Hawaii. I think that was more the focus of that case, and I don't think indirect impacts was really an issue in that case. Well, that was what the alien species were about, as I read it, that if you make the runway longer you can get more international flights, so the indirect effect is we'll get more alien species. Again, I think that case is very much distinguishable on its facts because it was an increase in the length of the runway and not an addition of a runway. And when we go through the case law, for example... But wasn't that an increase in capacity because you're increasing the length of the runway? I thought that was the concern. I believe the increase in when you're extending the runway, I don't think the argument there or the justification was that it was an increase in capacity, whereas here it's a given that there is an increase in capacity, the most effective capacity enhancement procedure that can be done at an airport. Again, every case that is out there right now is simply distinguishable on this fact that it's either extending a runway, which isn't alleged to be an increase in capacity, or it's a redesign of airspace, or it's a relocation of an existing runway. I think it really comes down to this issue, that if you increase the capacity dramatically as we have here and you don't require the agency to account for the indirect effects, at what point, if ever, would the indirect impacts ever be considered under the National Environmental Policy Act? So we said in a couple of cases, if you build something where there isn't existing demand, then you would have to consider growth-inducing impacts. So doesn't that answer that concern about you would never look at growth-inducing impacts? Sure. If I can address the case of Seattle Community Council Federation, a Ninth Circuit case, there was a change in flight patterns and they challenged it on the issue of indirect effects. In that case, the court specifically noted that the proposed procedures do not enhance ground capacity at SeaTac. There is no need to do so since there is existing ground capacity that is not fully used. Here, ground capacity has been fully used since 2005. In the Supplemental Excerpts of Record at 52, there's an email from 2008 from the FAA stating that the airport has been over capacity since 2005 and it is just getting busier. So I think Seattle Community Council Federation distinguishes that case because it says, well, you don't have to account for it because there's no need to do so since there's existing ground capacity at the airport. Can I ask you, what are you asking us to do? What is it that you want? Essentially, remand to the agency to consider the issue of indirect effects or if the court deems that the issue of significance has been raised to require the agency to prepare an environmental impact statement on remand. So the first one wouldn't necessarily result in an EIS? It's petitioner's position that the indirect effects here are so significant that they would result. Well, again, the standard for significance is that it may result in significant environmental impacts. It's not that it will, it's that it may. And so here, I think dramatically increasing or doubling the capacity of the busiest airport in Oregon may result in significant impacts. I actually think it will, but the standard is may, so I think that's easily met there. And then if, for whatever reason, the issue of significance, this court determines that it was not raised, then it could just be remanded to assess indirect effects in another EA. Or if significance was in fact raised, then to do so in an EIS upon remand. Okay. Do you want to save some time for everybody? Yes, thank you. Thank you. Good morning. May it please the Court, I'm Maggie Smith on behalf of the United States. I will be splitting my time with the Port of Portland, and I've agreed to reserve seven minutes for the Port. The first thing I want to address is this misunderstanding, I think, about what it means that Hillsborough Airport is at 100% of its annual service volume. The petitioners appear to be under the impression that that means that airfield capacity is somehow operating as a ceiling on operations at Hillsborough, and that's simply not the case. Annual service volume is a measure of how efficient an airport can run, and that is how long of a delay a user might encounter in taking off and landing from the airport. It does not represent an absolute ceiling on operations, and in fact under the forecasts that were used in the environmental assessment, there is no indication that the Hillsborough Airport is anywhere near encountering a ceiling on operations such that it would be required to turn away flights. So we have this one case anyway, City of Los Angeles v. FAA, where we have language saying, demand for an airport, says the FAA, depends much more on location, runways, and ticket prices than on how nifty the terminal is. That must be the chief judge, nifty. And then there's a footnote that says, runway capacity is important, the agency concedes, but not affected by this project. Well, here we do have a change in runway capacity. So is our case law saying that where you have an existing demand curve and the construction is only to address that curve, you don't have to look at growth-inducing impacts? Are those distinguishable? Because we've said in this case, runways are different. I think, first of all, runway capacity can be important when it's operating as a ceiling on operations, and that's true of any type of capacity. Where it operates as a ceiling, as to how many flights can move in and out, it can be an important factor in demand. Secondly, the- Can you explain that a little bit more? I'm not sure I understand what you mean. Sure. At some point, and I think this is perhaps more relevant to the commercial airport realm, but at some point an airport is maybe not able to accept any more flights, that there's an actual ceiling on operations. And one can imagine that a runway would be so used that it would not permit additional flights to be scheduled. So then if you took no action, there would be no additional flights. If you added capacity, then there would be. Exactly. So there's a difference between the no action and the action. Under those circumstances. And I'd also like to say- But you're saying in your case, there wouldn't be that difference because you could double or you could have more. Under the 20-year forecast that's available in this case, the long-term forecast, there's no indication that Hillsboro will be anywhere close to reaching a ceiling. In fact, the maximum delay per operation is anticipated to be six minutes at the end of the forecast period. The other, I think, important point about city- And with the new runway? Will it go down? Is that with the new runway? That's absent the new runway. With the new runway? With the new runway in 2025, it's expected that delays will be around 30 seconds per operation. The other important point about city- That's a pretty significant improvement. It is, particularly when aggregated. Those minutes represent needless idling of airplanes and circling overhead of the neighborhoods. But as an individual user making a decision whether or not to fly their airplane, it doesn't seem to, in the FAA's experience, those types of efficiency improvements do not have an impact on user choices. On demand? On demand. That's correct. And to go back to your point about city of Los Angeles, I'd also like to clarify that that involved LAX, which is a commercial airport, extremely busy, where flights are scheduled and commercial carriers can control their schedules. This is-Hillsborough Airport is a general aviation airport. It does not have commercial carriers that operate in and out of it. Flights are not scheduled there. When flights occur are dictated by the individual preferences of users. And so the ability to maximize use of available capacity is different. Counsel, with this additional runway and its length, is it possible that a commercial aircraft would be authorized to land there at some point? No. And, in fact, the new runway is going to be shorter than the existing runway, is my understanding. I think to go back to the case laws, this court has consistently determined that these types of efficiency gains in airplanes and managing airports, and this is precisely what we have here with the new runway, there will be an efficiency gain in allowing planes to get in and out more quickly and more smoothly. That under those circumstances, potential induced growth from those efficiency gains is simply not something that the agency needs to look at. And I would say, in addition to that, in this case, the FAA did do forecasts, did update those forecasts for this project and determined that demand was going to be constant regardless of which alternative was selected. I'd also like to address that the petitioners in this case have never provided any sort of explanation as to why the addition of a runway is likely to induce growth. We don't have any sort of causal mechanism that would tell us why somebody would alter their plans to buy an airplane or obtain a pilot's license based on the building of a new runway. If there were studies, that could probably be determined, and would that be an important point? Whether or not there are studies, if the petitioners could show us some studies that indicate that a new runway is likely to increase demand, I think that would be important, but there's nothing like that in the record. What I'm saying is maybe the FAA should have made such a study itself. Well, the FAA did the forecast, which was, and it's in incredible detail in the master plan, that details absolutely everything that went into building these demand curves. So that issue has been addressed at length, and this type of argument, I think, is one of those things that to an aviation expert simply is not on the radar screen, because there's just no evidence and there's no causal mechanism between this type of project and an increase in demand. And furthermore, I'd like to point out that the FAA determined that the efficiency gains from the project would in fact decrease air emissions and would improve noise conditions for the surrounding community. And so it's not enough that even assuming that there were some small amount of demand that occurred because of the new runway, it would have to outstrip those efficiency gains and the air pollution decreases from those efficiency gains and then further cause a significant impact to the environment. And there's just absolutely nothing we can point to to indicate that that's likely. So before we even get there, I guess, the threshold question is whether the comments or the responses were sufficient to put the port and the FAA on notice that this was the concern of the commenters. And opposing counsel's view is, well, in several places in your response, you say there's no difference in use between the no-action alternative and the action alternative. Given the low threshold in NEPA, is that enough? No. I mean, the comments when read in context clearly show that the petitioners were saying, we don't like this airport, we think it's noisy, and it impacts our life. And in response, the FAA said, we understand your concern, and it's our belief that this project will improve those things. What the comments never do is put the agency on notice that the petitioners believed that the project would increase the amount of. What about the comment from the fellow? Pardon? The comment from I think the fellow's name that was there. Oh, Mr. Ackerley? Yes. That counsel quoted to us. Sure. I mean, Mr. Ackerley. I don't know, maybe they are sophisticated people, but I mean they're upset that they're going to expand the runway. That's right. And he's up there giving his remarks, and why isn't that enough? Because he never. It's not an adversarial proceeding. That's absolutely right. All the agency is asking is that it's put on notice as to what the claim is or what the issue is. I mean, when you read Mr. Ackerley's comment, what he's saying is that this is a noisy airport, and if it gets noisier, that's going to be bad for me. And they would say, well, it's not going to get noisier because we're not going to increase demand. But there's no indication that he disagreed with that. And I'd like to point out, if you look at the EA, it's very clear that this was a finding that the agency made, that implementing the proposed action was going to decrease air emissions and was going to decrease noise. It's not hidden in the document. It's very clear on the face of the EA. And yet none of the petitioners said, I don't think that's right or I disagree with that. And absent saying that, the agency is not put on notice that they're going to be sued on those grounds, and it doesn't have a meaningful opportunity to respond to those comments in the record. And I think even though their responses indicate that they are trying to explain to people that they believed that their concerns were going to be That doesn't constitute a meaningful opportunity to fully explain the rationale behind that. I just want to have a picture of this hearing that took place. Sure. Was there somebody from the FAA there sort of running the show? Under the AAIA, this type of hearing is to be run by the project sponsor. So there was somebody there from the Port Authority. Somebody from the Port was there. Organizing it, saying what they were going to do, and they had pictures. Right. There were several stations that outlined the project. And then there was a period of time for people just to speak about what was their concern? There was a testimony, an area where they could give oral testimony to the designated hearing officer and a stenographer so that it would be accurately recorded. They had an ability to talk one-on-one to project sponsors, and then there was a slideshow outlining the project. And do they have the ability to ask any official from the Port Authority about the plans? Yes, yes. The Port Authority was there, and they were there to interact with the Port of Portland officials. Putting in a new runway is a pretty dramatic action. It would seem that the agency would just naturally think it's going to be significant, so we better do an EIS. Why isn't this the thinking of the agency? Because all of the data in front of the agency, all of the forecasts indicated that that wasn't the case, that demand wouldn't be increased by the runway, and that the on-site impact from the runway would not rise to the level of a significant environmental effect. I don't think that we can create a per se rule that this type of project requires an EIS in all instances. And in this case, where we have a general aviation airport that is at 100% of ASV, there's just absolutely no indication that there is going to be more use from the airport by adding the new runway. But it sounds like there's no need to construct the runway if there's going to be no increase in traffic. Demand is going to increase whether or not the new runway is implemented. And the FAA does have an interest in building the new runway because it is tasked by Congress with maintaining the safety and efficiency of the national airspace system. And in order to do that, it has its mission of keeping airports below their annual service volume. Thank you. I have one last question. I'll make sure the report gets there in time. I just have one last question. I asked counsel what he was asking for, and he told us that if we were to remand the case or saw the case his way, he gave us what he thought we should do. What's your response to that? I think that at its core, this is more of a failure to explain case. I think what the petitioners are saying is that they don't understand the reasoning of the agency as to why demand is not going to increase. So if you were to accept that argument, we would ask that it be remanded back to the agency for reconsideration at that point. Okay. Not necessarily, I mean, not for preparation of NEIS, but something preliminary. That's correct. So are you suggesting that they didn't forfeit their claim, that they did sufficiently raise their claim so that we should then go on and reach the merits? Absolutely not, Your Honor. It's our strong contention that the agency was never put on notice under the standard in public citizen that the petitioners believed that this project would generate new demand for the airport. And, in fact, I think they indicated almost the opposite in their comments to the agency. And I think if you look at the comments that opposing counsel brought to your attention and you read them in context, the only fair way to look at those is that they were about other issues and not the issue that's been brought before this court.  Thank you. Thank you. Good morning, Your Honors. My name is Beth Ginsberg. I'm with the law firm of Stoll-Rees, and together with my colleague Jason Morgan, we represent the Port of Portland. If I may, I'd like to introduce the court to a couple of important people from the Port of Portland who drove up here this morning for today's arguments. Renee Dollin is here, and she is the Environmental Project Manager. Terry Burke is the Aviation Project Manager, and Mr. Ian Whitlock is the Assistant General Counsel. This case is obviously very important to the court. I have two main points that I'd like to start with. I'd like to make sure that the court really understands the meaning of the term capacity as it's used in these general aviation forecasts. What does it mean for a general aviation airport like Hillsboro to enhance its capacity? In this case, it doesn't mean it's going to increase airport usage. It doesn't mean that there's an increase in demand for flights or an increase in annual operations. What it means is we're currently at 100% of capacity because we're experiencing an average delay right now of one minute, and the FAA considers that unacceptable. And the FAA tells the port to do something about that now, actually before now. If we do nothing to address this problem, by 2025 we'll be at 146% of capacity. That means we'll be experiencing a six-minute delay per flight. It doesn't mean that if we build a runway this spring, twice the amount of air traffic will be at Hillsboro this fall. That's not what it means. Now, again, FAA guidance requires the port to start addressing this capacity problem, this delay problem, before it reached the point we're at right now, and the port began this years ago. So I want to explain the difference in the term ground capacity expansion as used by the court in Ocean Advocates is very different. In Ocean Advocates, that was the Cherry Point dock, and there BP, British Petroleum, wanted to expand the dock so that more ships could call and more petroleum could be loaded and unloaded, more refining could take place. That's increasing capacity there. Very, very different term of our usage. It's incredibly important. In Ocean Advocates, the difference there was the Corps of Engineers except BP's statement that they weren't really going to be increasing capacity and they weren't going to have a future demand effect, and, therefore, they didn't need to do an EIS to address those future growth impacts, more ships calling, more petroleum being refined, more environmental emissions. In our case, the FAA didn't just trust the port. The port did its own demand calculations, and then the FAA did theirs. They were slightly different. The port determined that whether or not it built the runway, there would be a 1% increase in demand over the course of the 20-year period that they forecast. The FAA did their own, and they came up with something more like 1.4, and they reconciled that. They agreed that demand was constant, and that's the difference between this case and perhaps building a runway someplace else at a commercial airport. Demand for a general aviation airport like this is constant, and there isn't anything in the record to suggest otherwise. What we have are post hoc speculations of counsel. That's what we have because no one made this argument. Getting to the waiver point, I would say, had the port been aware that people were concerned about this specific issue, the aviation forecast issue, it probably would have spent more time explaining it. But if you look at the record, there's quite a bit of information there. There are several aviation forecasts. There were the ports. There were the FAAs. The FAA did an initial one, I believe, in 2003, and then it updated it again in 2008 and again in 2009. It surveyed pilots, and it surveyed crop dusters, and it surveyed emergency medical services, and it determined that demand was going to be constant whether they built it or not. Then they determined they went further, and they decided, well, what would be the effect if we didn't build? If we didn't build, we would have all this delay, and we would have more noise and more air pollution because the planes circle as they're trying to land. Council, are small planes authorized to land at the commercial airport? So it's a question of where they land. I am not sure whether they're authorized to do it. I think it's preferred that they come to a general aviation airport like Hillsboro because Hillsboro can accommodate smaller flights and sort of different kinds of flights, and it's much more difficult for those kinds of flights to go in and out of like PDX, and I think it's the preference of the FAA to have these kinds of general aviation airports to steer those kinds of sort of otter aircraft. So the contemplation is that for increases in general aviation, you want them to land at this airport? That's right. And that the new runway would accommodate that? That's right, that the new runway. And what's really – let me go to my second point. I think it can't be stressed enough here how important it is to understand that what we're dealing with is not a commercial airport. We're not dealing with CTAC or PDX or LAX. We're dealing with a general aviation reliever airport. So the notion that if you build it, they will come, which was used in the LAX case, you know, that's not true, right? In that case, we're talking about expansion of a runway at a commercial airport. In this court held, it can't be presupposed that if you build it, they will come. And in our case, that couldn't be more true because demand, again, is constant. It does not respond to commercial impetus. And this is the defining feature of this case. It's the feature that demonstrates the petitioner's assertions are not only purely speculative, but they're countered by the actual aviation forecast that we have here in the record. And there isn't anything – and there's a good common sense point here because what we're talking about is a reduction in five minutes of delay, right? Because if we do nothing by 2025, we'll be a delay at six minutes. And if we construct the runway, we will eliminate that delay. That reduction in five or six minutes is not going to make a crop duster decide, I'm going to all of a sudden go to Hillsboro because I can do my thing quicker. And it's not going to make a flight school decide, I'm going to go to Hillsboro as opposed to Troutdale. Building the runway at this general aviation airport is not like building a runway at a commercial airport. So, again, against this very robust record, what we have here is just post hoc speculation. Getting to the waiver question again, we would certainly not concede that they have – that the petitioners have made out a claim that really can be heard by this court. They really were required to do more, even in a pro se capacity. I don't understand public citizen, which is this Supreme Court's articulation I'm sorry, to make a distinction for pro se folks. The case that petitioners rely on for an exception to the Supreme Court's rule in public citizen is a social security case. This court is bound by the holding in public citizen. There is the Ilugiani case that this court decided after public citizen, which held that there's a so obvious exception to that rule. The so obvious exception here doesn't apply either because the comment that one of the petitioners actually made was demand is low at Hillsboro. It's low and it's getting lower. And if you read the comments carefully, and we put them out in our brief in detail, the contention was there is no need to spend public funds, limited public funds on another runway. There's just no need. So now we've got post hoc assertions of counsel saying, well, demand is high and getting higher. So really from the perspective of the port, they really weren't unnoticed that this very, very technical issue of aviation forecasting was in contention. It was very obvious to them. And had it been put forward to the port, I am sure the port, who very much wants to build this new runway, would have explained it in a lot more detail. So I don't think it's fair at this point. I believe public citizen is controlling, not Sims versus Apfel. They haven't made out a claim that this court really can hear. But if it decides to hear it, I think the record is more than robust on these issues. Thank you. Thank you. To address several points that were just raised. First, the most recent one. Opposing counsel stated that petitioner Barnes said that demand is low at Hillsborough Airport. That is purely not true. What she said was demand is low at other airports in the region, including Troutdale and PDX. So the question is, why do we keep increasing the capacity at Hillsborough? She's the one that informed the FAA and the Port of Portland that this is the busiest airport in the state. They didn't even know that during the draft environmental assessment. Moving on to this issue that ground capacity in Ocean Advocates is somehow distinguishable from this case. That simply makes little sense because in Ocean Advocates, they cited to several FAA cases and distinguished them, saying, and I quote, Morongo and Seattle Community Council Federation are also distinguishable because neither case dealt with any change in ground capacity. In both cases, the increased flight volume was a function of new routes into the same airport terminal, whereas in this case, whatever increase in tanker traffic may occur results from the expansion of the pier itself. The analogy to the expansion of the runway is there. And they specifically cite these FAA cases. And in that case, the demand for oil was constant. Just as they're saying here, the demand for aircraft operations is constant. We all know demand for oil is constant. And again, just to address Blaine Ackley's comment, again, he stated, and I quote, Increased air traffic will affect our quality of life. That simply raises the issue of increased air traffic. And to go on to this notion of annual service volume, the definition of that is, and I quote from Excerpts of Record 37, The annual service volume is an estimate of an airport's annual operating capacity or the number of aircraft operations an airfield could accommodate in the course of a typical year. So this notion of floors and ceilings within airport capacity is somewhat, I think, misleading. And then in the email that I referenced earlier on Excerpts of Record 52, the FAA stated that forecast, they said, I think we will need, excuse me, I don't think we will need this forecast to provide justification for the third runway because they were already over capacity back in 2005 and it is just getting busier. And to go on to this next point, that there is no difference in the case law between a commercial airport and a general aviation airport. If anything, there are more impacts associated with a general aviation airport because you have the constant presence of aircraft. At a commercial airport, flights either depart or they arrive. At general aviation airports, it's flight training. They're circling around. They're performing low flying exercises. They're doing this touch and go takeoff maneuver where they practice landing and taking off. They land. Then they immediately take off. They circle. They land immediately. So the difference is that at a general aviation airport, you actually have much more environmental impacts. And to go to the issue of indirect effects again, indirect effects include those that are later in time. It's not just growth inducing. It's those that are later in time. And the definition specifically says air and water. Here, when would we ever take into account the increase in air emissions from all these planes that will be filling the newly created ground capacity at this airport? And what's interesting is that the other respondents alleged that there would be a decrease from the alleged increase in efficiency, but that is never compared to the potential that the capacity will be filled and that there may be more air emissions as a result of that capacity being filled. I think you're just about over your time. Okay. Thank you. Thank you. We appreciate counsel's arguments this morning. Very helpful. And the matter is submitted at this time and we'll take a recess until tomorrow morning. All rise.
judges: Fletcher B. , Paez, Ikuta